## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

HUTTON & HUTTON LAW
FIRM, LLC,

          Plaintiff,

v.

GIRARDI & KEESE, ET AL.,

          Defendants.

Case No. 13-1462-DDC-KGS

### MEMORANDUM AND ORDER

Plaintiff Hutton & Hutton Law Firm, LLC, a Kansas law firm, brings this lawsuit against a California law firm, Girardi & Keese, and one of its attorneys, Thomas V. Girardi, alleging that defendants owe referral attorneys' fees to plaintiff.  Plaintiff filed this case in the District Court of Sedgwick County, Kansas, and defendants removed it to this Court asserting diversity of citizenship under 28 U.S.C. § 1332.  This matter is now before the Court on defendants' Motion to Dismiss or, Alternatively, to Compel Arbitration (Doc. 9).  After considering the parties' arguments, the Court grants in part and denies in part defendants' motion.

### I.      Factual Background

Because this matter is before the Court on a motion to dismiss for lack for personal jurisdiction, all well pleaded factual allegations in plaintiff's Petition (Doc. 1-1), to the extent they are uncontroverted by affidavits or other written evidence, are accepted as true and viewed in the light most favorable to the plaintiff.  *Wenz v. Memery Crystal*, 55 F.3d 1503, 1505 (10th Cir. 1995).  If the parties provide conflicting affidavits, the Court must resolve those factual disputes in the plaintiff's favor.  *Id.*

1

Plaintiff is a Kansas law firm with its principal place of business in Wichita, Kansas. Defendant Girardi & Keese ("G&K") is a California law firm with its principal place of business in Los Angeles, California. G&K regularly represents clients nationwide in various actions, including clients in the state of Kansas. G&K relies on referrals from attorneys across the United States to obtain clients, and it actively seeks referrals through various forums, including the firm's website. Defendant Thomas V. Girardi ("Mr. Girardi") is a founding partner of G&K and represents clients nationwide in various actions. He is currently co-lead counsel for plaintiffs in a case pending in the District of Kansas[1] that bears no connection to this lawsuit.

Plaintiff represented various clients in lawsuits alleging injury from the use of Avandia, a diabetes medication manufactured by GlaxoSmithKline. In late spring or early summer of 2009, Mr. Girardi solicited plaintiff, asking it to retain G&K as co-counsel for plaintiff's clients in the Avandia lawsuits. Plaintiff agreed. The law firms reached a joint representation and fee division agreement governing the amount of attorneys' fees that each law firm would receive for settlement of the Avandia cases that plaintiff had referred to G&K. Eventually, the firms represented jointly 54 Avandia clients under their agreement. Nineteen of them resided in Kansas.

Plaintiff prepared and assembled information at its offices in Kansas about the jointly-represented clients and, upon defendants' request, sent the information to G&K to facilitate settlement of the claims. In approximately April 2012, G&K settled all of its Avandia cases with GlaxoSmithKline, including those cases brought by plaintiff and G&K's jointly represented clients.

Plaintiff alleges defendants failed to pay the attorneys' fees plaintiff is owed under the law firms' fee sharing agreement. Plaintiff asserts two claims—one for a breach of contract

---

[1]     *In Re Motor Fuel Temperature Sales Practices Litig.*, MDL No. 1840, No. 07-MD-1840-KHV.

(Count I) and the other for breach of fiduciary duty (Count II)—based on defendants' failure to pay plaintiff the attorneys' fees it claims defendants owe.

Plaintiff also asserts a defamation claim (Count III) against Mr. Girardi based on statements made in a letter that G&K sent and Mr. Girardi signed.  G&K sent the letter to clients represented jointly by the two law firms.  During the two law firms' joint representation in the Avandia cases, plaintiff sued defendants on fee division agreements that the parties had reached in separate cases.[2]  In response, Mr. Girardi sent a letter to each jointly-represented client requesting that they choose either plaintiff or G&K to represent them in their lawsuits going forward.  In that letter, Mr. Girardi stated that plaintiff had "done no work in the litigation."  Pl.'s Pet. (Doc. 1-1) at ¶ 25.  He also asserted, "Hutton & Hutton did nothing.  I doubt if they can even spell the word Avandia."  *Id.*  Plaintiff alleges that these statements communicated false and defamatory statements about it to the 54 jointly-represented clients, some of whom are Kansas residents.

Defendants move to dismiss the lawsuit under Fed. R. Civ. P. 12(b)(2), asserting the Court lacks personal jurisdiction over them.  Alternatively, if personal jurisdiction exists, defendants seek an order from the Court compelling arbitration.  Finally, if the Court denies both aspects of defendants' motion, defendants argue that the Court should dismiss plaintiff's breach of fiduciary duty (Count II) and defamation (Count III) claims because they purportedly fail to state a claim for relief under Fed. R. Civ. P. 12(b)(6).  The Court addresses defendants' motions and arguments below.

---

[2]      The lawsuit involving the parties' dispute over those separate cases is captioned *Hutton & Hutton Law Firm, LLC v. Girardi & Keese and Thomas V. Girardi*, No. 13-1115-RDR (D. Kan.).

II.     **Motion to Dismiss for Lack of Personal Jurisdiction**

    A. **Legal Standard**

Plaintiff bears the burden of establishing personal jurisdiction over defendants.

*Rockwood Select Asset Fund XI (6)-1, LLC v. Devine, Millimet & Branch*, 750 F.3d 1178, 1179–

80 (10th Cir. 2014) (citation omitted).  But in the preliminary stages of litigation, plaintiff's

burden to prove personal jurisdiction is light.  *AST Sports Sci., Inc. v. CLF Distrib. Ltd.*, 514 F.3d

1054, 1056 (10th Cir. 2008) (citation omitted).  Where, as here, the Court considers a pretrial

motion to dismiss for lack of personal jurisdiction without conducting an evidentiary hearing, the

plaintiff only must make a prima facie showing of jurisdiction to defeat the motion.  *Id.* at 1056–

57 (citing *OMI Holdings, Inc. v. Royal Ins. Co. of Can.*, 149 F.3d 1086, 1091 (10th Cir. 1998)).

"The plaintiff may make this prima facie showing by demonstrating, via affidavit or other

written materials, facts that if true would support jurisdiction over the defendant."  *OMI

Holdings, Inc.*, 149 F.3d at 1091.  To defeat plaintiff's prima facie showing of personal

jurisdiction, defendants "must present a compelling case demonstrating 'that the presence of

some other considerations would render jurisdiction unreasonable.'"  *Id.* (quoting *Burger King

Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985)).

In a diversity action like this one, a plaintiff must show that exercising jurisdiction is

proper under the laws of the forum state and that doing so comports with the due process

requirements of the Constitution.  *Federated Rural Elec. Ins. Corp. v. Kootenai Elec. Coop.*, 17

F.3d 1302, 1304–05 (10th Cir. 1994) (citation omitted).  Kansas' long-arm statute is construed

liberally to permit the exercise of any jurisdiction that is consistent with the United States

Constitution.  *Id.* at 1305; *see also* K.S.A. § 60-308(b)(1)(L) & (b)(2).  Thus, it is unnecessary

for the Court to conduct a separate personal jurisdiction analysis under Kansas law, and instead,

the Court may proceed directly to the due process injury. *Federated Rural Elec. Ins. Corp.*, 17 F.3d at 1305; *see also Niemi v. Lasshofer*, 770 F.3d 1331, 1348 (10th Cir. Nov. 4, 2014) (where the state's long-arm statute "confers the maximum jurisdiction permissible consistent with the Due Process Clause . . . the first, statutory, inquiry effectively collapses into the second, constitutional, analysis." (citation and internal quotation marks omitted)).

This due process analysis involves a two-step inquiry:  (1) first, the Court must determine whether the defendant has "minimum contacts with the forum state such that he should reasonably anticipate being haled into court there;" and (2) second, if the defendant's actions establish minimum contacts, the Court must then decide "whether the exercise of personal jurisdiction over the defendant offends traditional notions of fair play and substantial justice." *AST Sports Sci., Inc.*, 514 F.3d at 1057 (citations and internal quotation marks omitted).

### 1.  Minimum Contacts

The due process clause permits the exercise of personal jurisdiction over a nonresident defendant so long as the defendant purposefully has established "minimum contacts" with the forum state. *Burger King*, 471 U.S. at 474.  The "minimum contacts" standard is satisfied by establishing either (1) specific jurisdiction or (2) general jurisdiction. *Rockwood Select Asset Fund*, 750 F.3d at 1179.  First, a court may assert *specific* jurisdiction over a nonresident defendant "'if the defendant has "purposefully directed" his activities at residents of the forum, and the litigation results from alleged injuries that "arise out of or relate to" those activities.'" *OMI Holdings, Inc.*, 149 F.3d at 1090–91 (quoting *Burger King*, 471 U.S. at 472).  Second, if "a court's exercise of jurisdiction does not directly arise from a defendant's forum-related activities, the court may nonetheless maintain *general* personal jurisdiction over the defendant based on the

defendant's general business contacts with the forum state." *Id.* at 1091 (citing *Helicopteros Nacionales de Colombia v. Hall*, 466 U.S. 408, 415 (1984)).

### a. Specific Jurisdiction

A court may exercise specific jurisdiction if: (1) the out-of-state defendant "purposefully directed" his activities at residents of the forum state and (2) the plaintiff's injuries arose from those purposefully directed activities. *Newsome v. Gallacher*, 722 F.3d 1257, 1264 (10th Cir. 2013) (citation omitted). The Tenth Circuit analyzes the "purposefully directed" requirement differently depending upon the cause of action alleged. *See Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1071 (10th Cir. 2008). "In the tort context, we often ask whether the nonresident defendant 'purposefully directed' its activities at the forum state; in contract cases, meanwhile, we sometimes ask whether the defendant 'purposefully availed' itself of the privilege of conducting activities or consummating a transaction in the forum state." *Id.* (citations omitted). "In all events, the shared aim of [the] 'purposeful direction' doctrine has been said by the Supreme Court to ensure that an out-of-state defendant is not bound to appear to account for merely 'random, fortuitous, or attenuated contacts' with the forum state." *Id.* (quoting *Burger King*, 471 U.S. at 475).

Last year, the Supreme Court addressed the issue of "minimum contacts" necessary to create specific jurisdiction. *Walden v. Fiore*, ___ U.S. ___, 134 S. Ct. 1115, 1121 (2014). In a unanimous opinion, the Court explained, "[f]or a State to exercise jurisdiction consistent with due process, the defendant's suit-related conduct must create a substantial connection with the forum State." *Id.* The Court emphasized two related aspects of the defendant's relationship with the forum state that must exist for a court to exercise jurisdiction over a nonresident defendant. *See id.* at 1121–22.

First, the relationship between the defendant and the forum State must arise out of contacts that the "defendant himself" creates with the forum State. *Id.* at 1122 (citing *Burger King*, 471 U.S. at 475). "Due process limits on a State's adjudicative authority principally protect the liberty of the nonresident defendant—not the convenience of plaintiffs or third parties." *Id.* (citation omitted). The Supreme Court "consistently [has] rejected attempts to satisfy the defendant-focused 'minimum contacts' inquiry by demonstrating contacts between the plaintiff . . . and the forum State." *Id.* (citation omitted). "Put simply, however significant the plaintiff's contacts with the forum may be, those contacts cannot be decisive in determining whether the defendant's due process rights are violated." *Id.* (citation and internal quotation marks omitted).

Second, the "minimum contacts" analysis must focus on "the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there." *Id.* (citations omitted). Thus, the Supreme Court has found personal jurisdiction exists "over defendants who have purposefully 'reach[ed] out beyond' their State and into another [state] by, for example, entering a contractual relationship that 'envisioned continuing and wide-reaching contacts' in the forum State." *Id.* (quoting *Burger King*, 471 U.S. at 479–480). The Court also has upheld the assertion of jurisdiction where a defendant "circulat[ed] magazines to 'deliberately exploi[t]' a market in the forum State." *Id.* (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 781 (1984)). In addition, while "physical presence in the forum is not a prerequisite to jurisdiction, physical entry into the State—either by the defendant in person or through an agent, goods, mail, or some other means—is certainly a relevant contact." *Id.* (citations omitted). But a plaintiff "cannot be the only link between the defendant and the forum." *Id.* "Rather, it is the defendant's conduct that must form the necessary connection with the forum State that is the basis for its

jurisdiction over him." *Id.* (citations omitted).  To put it another way, "a defendant's relationship with a plaintiff or third party, standing alone, is an insufficient basis for jurisdiction." *Id.* at 1123 (citation omitted).  "Due process requires that a defendant be haled into court in a forum State based on his own affiliation with the State, not based on the 'random, fortuitous, or attenuated' contacts he makes by interacting with other persons affiliated with the State." *Id.* (quoting *Burger King*, 471 U.S. at 475).

### b.  General Jurisdiction

A court may exercise general jurisdiction if the defendant's contacts with the forum are "'so continuous and systematic as to render [it] essentially at home in the forum State.'" *Fireman's Fund Ins. Co. v. Thyssen Mining Constr. of Can., Ltd.*, 703 F.3d 488, 493 (10th Cir. 2012) (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, ___ U.S. ___, 131 S. Ct. 2846, 2851 (2011)).  With general jurisdiction, the court's jurisdiction does not arise directly from a defendant's forum-related activities; instead, the court may maintain general personal jurisdiction over the defendant based on the defendant's business contacts with the forum state. *OMI Holdings, Inc.*, 149 F.3d at 1091 (citing *Helicopteros*, 466 U.S. at 415).  But, because general jurisdiction is not related to the events giving rise to the suit, courts must impose "a more stringent minimum contacts test" before asserting general jurisdiction, one that "requir[es] the plaintiff to demonstrate the defendant's continuous and systematic general business contacts." *Id.* (citations and internal quotation marks omitted).

When considering a corporation's contacts with a forum for purposes of determining whether general jurisdiction exists, "courts have considered such factors as:  (1) whether the corporation solicits business in the state through a local office or agents; (2) whether the corporation sends agents into the state on a regular basis to solicit business; (3) the extent to

which the corporation holds itself out as doing business in the forum state, through advertisements, listings or bank accounts; and (4) the volume of business conducted in the state by the corporation." *Trierweiler v. Croxton & Trench Holding Corp.*, 90 F.3d 1523, 1533 (10th Cir. 1996).

### 2. Fair Play and Substantial Justice

Even when a defendant's actions create sufficient minimum contacts, the court must still decide whether the exercise of personal jurisdiction "would offend traditional notions of fair play and substantial justice." *Newsome v. Gallacher*, 722 F.3d 1257, 1271 (10th Cir. 2013) (citation and internal quotation marks omitted). "'Such cases are rare.'" *Id.* (quoting *Rusakiewicz v. Lowe*, 556 F.3d 1095, 1102 (10th Cir. 2009)). "The defendant 'must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable.'" *Id.* (quoting *Burger King*, 471 U.S. at 477). To determine whether the exercise of jurisdiction is unreasonable, courts consider the following five factors:

> (1) the burden on the defendant, (2) the forum state's interest in resolving the dispute, (3) the plaintiff's interest in receiving convenient and effective relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interest of the several states in furthering fundamental substantive social policies.

*OMI Holdings, Inc.*, 149 F.3d at 1095 (citing *Asahi Metal Indus. Co. v. Superior Court of Cal.*, 480 U.S. 102, 113 (1987)).

### B. Personal Jurisdiction Over Defendants

Defendants argue here that the Court lacks both general and specific jurisdiction and therefore must dismiss this case. In its response to defendants' motion, plaintiff recognizes that our Court previously determined that both defendants lacked "continuous and systematic" contacts with Kansas to subject them to general jurisdiction. *See Hutton & Hutton Law Firm,*

*LLC v. Girardi & Keese*, No. 13-1115-RDR, 2014 WL 36313, at *6 (D. Kan. Jan. 6, 2014).
Nevertheless, plaintiff asserts that it "continues to believe that a finding of general jurisdiction
could be made here" but "it is not pressing that point" because it contends that "specific
jurisdiction clearly exists."  Pl.'s Resp. to Defs.' Mot. to Dismiss (Doc. 16 at 10 n.3).

The Court agrees with defendants that the facts alleged will not abide the conclusion that
general jurisdiction over defendants exists here.  There are no allegations that defendants ever
have resided, owned property, had any employees, or had a registered agent for service of
process in Kansas.  Consequently, plaintiff has failed to allege facts to establish the factors
outlined by the Tenth Circuit in *Trierweiler*.  Plaintiff has not alleged that defendants solicit
business in Kansas through a local office or agents, that defendants sent agents to the state on a
regular basis to solicit business, that defendants hold themselves out as doing business in Kansas,
or that defendants conduct significant business in Kansas.  *See Trierweiler*, 90 F.3d at 1533.
Therefore, the Court concludes that plaintiff has not met the "more stringent minimum contacts
test" for establishing general jurisdiction because plaintiff has not shown "continuous and
systematic general business contacts" by defendants in Kansas.  *See OMI Holdings, Inc.*, 149
F.3d at 1091.  So the Court next turns to plaintiff's assertion that it has shown specific
jurisdiction exists and thus the Court has personal jurisdiction over defendants.

### 1.  Specific Jurisdiction Over Girardi & Keese

Plaintiff asserts that G&K "purposefully directed" activities at the forum state which
produced the injuries alleged by plaintiff in this lawsuit by:  (1) soliciting business from plaintiff
in Kansas; (2) corresponding with plaintiff in Kansas by telephone, mail, facsimile, and email;
(3) requesting plaintiff in Kansas to prepare, assemble, and send information about the jointly-
represented clients to G&K to facilitate a settlement of the claims; (4) communicating with

clients in Kansas; and (5) sending partial settlement checks to the Kansas clients for settlement of their Avandia claims.  Defendants argue in response that they have not entered Kansas for any reason related to the parties' relationship and that their only contact with the forum was occasional communications that they dispatched from California.  Defendants thus argue that their contacts are insufficient to show that G&K purposefully has directed its activities to Kansas.

The Court disagrees.  Viewing defendants' contacts with Kansas as a whole and in the light most favorable to plaintiff, plaintiff has met its burden to make a prima facie showing that G&K's suit-related contacts with Kansas are sufficient to confer personal jurisdiction over it.  So long as the exercise of personal jurisdiction does not offend traditional notions of fair play and substantial justice—which is discussed below—plaintiff has properly sued G&K in this forum.

First, G&K purposefully directed its activities at Kansas by soliciting business from plaintiff.  Plaintiff alleges that G&K, through Mr. Girardi, contacted it by telephone to request that plaintiff retain G&K as co-counsel for clients plaintiff already was representing in Avandia lawsuits.  Plaintiff asserts it did not solicit G&K's communication, but instead that G&K initiated the communications with plaintiff.  Solicitation "is some evidence suggesting purposeful availment" by a defendant.  *Far W. Capital, Inc. v. Towne*, 46 F.3d 1071, 1076 (10th Cir. 1995) (citing *Burger King*, 471 U.S. at 473 (emphasizing that parties who reach into another state to create continuing contractual relationships are subject to personal jurisdiction)); *cf. Newsome v. Gallacher*, 722 F.3d 1257, 1280–81 (10th Cir. 2013) ("an out-of-state attorney working from out-of-state on an out-of-state matter does not purposefully avail himself of the client's home forum's laws and privileges, *at least not without some evidence that the attorney reached out to the client's home forum to solicit the client's business*" (emphasis added)).

11

Here, G&K reached into Kansas to create a contractual relationship with plaintiff. Defendants argue that this was not a "continuing relationship" and thus differs from the relationship at issue in *Burger King*.  There, the plaintiff and defendant entered into a franchise agreement and "thereby link[ed] themselves to each other indefinitely, through a joint business enterprise."  Defs.' Reply Brief in Supp. of Mot. to Dismiss (Doc. 19 at 7).  In *Burger King*, the parties did not agree to an "indefinite" relationship but they did agree to a 20-year franchise relationship.  *Burger King*, 471 U.S. at 467.  While the contractual relationship in *Burger King* was longer than the one contemplated by the parties here, this factual distinction is not dispositive.  Here, the parties contemplated a "continuing relationship" as they jointly-represented Avandia clients through settlement or other resolution of their lawsuits, which lasted from late spring or early summer 2009 through the settlement of the cases in April 2012.  By reaching into Kansas to create a continuing relationship with plaintiff, G&K purposefully availed itself of the opportunity to conduct business in Kansas.

Several times, our Court has come to the same conclusion when presented with similar facts.  *See, e.g.*, *Vestring v. Halla*, 920 F. Supp. 2d 1189, 1195 (D. Kan. 2013) (holding that defendant had established sufficient minimum contacts with Kansas when he "personally and intentionally solicited Kansas residents for business over the phone and offered them a contract, which they accepted"); *see also Cargill Meat Solutions Corp. v. Premium Beef Feeders, LLC*, No. 13–CV–1168–EFM, 2014 WL 172197, at *3 (D. Kan. Jan. 15, 2014) (holding that defendant had sufficient minimum contacts with Kansas when it sought plaintiff's business, negotiated with plaintiff until a contract was formed, and continued their contractual relationship for more than a year, as evidenced by payments and frequent communication with the Kansas plaintiff); *Skepnek v. Roper & Twardowsky, LLC*, No. 11-4102-KHV, 2012 WL 4463490, at *3 (D. Kan. Sept. 27,

2012) (asserting specific jurisdiction over a New Jersey law firm and lawyer who contacted two Kansas lawyers about jointly handling litigation in New Jersey); *Ronning Eng'g Co., Inc. v. Adkins Energy, LLC*, No. 04-2096-CM, slip op. at 8 (D. Kan. Nov. 9, 2004) (concluding that defendant had sufficient minimum contacts with the forum where it had solicited plaintiff in Kansas and had entered into an agreement for plaintiff to perform repairs on a large commercial dryer).

Defendants try to distinguish cases such as *Ronning* by arguing that the agreement there required plaintiff to perform work in the forum state, but the parties' agreement here involved litigation and settlement of lawsuits pending in California. But the defendant in *Ronnig* made a similar argument contending that it did not know or agree that the parties would perform any part of their contract in Kansas. Judge Murguia rejected this argument in *Ronnig* because, though the plaintiff actually performed the repairs to the commercial dryer in Illinois, defendant "should have anticipated that [plaintiff] would perform the design and engineering work at its Kansas office before it actually repaired the dryer in Illinois." *Ronning*, slip op. at 8. Here, plaintiff contends that it prepared and assembled information and sent it to G&K, *at defendants' request*. Like the defendant in *Ronning*, G&K should have anticipated that plaintiff would perform work to discharge its part of the bargain in Kansas, especially because defendants requested the Kansas plaintiff to perform that work.

Second, G&K corresponded with plaintiff in Kansas by telephone, mail, facsimile, and email. And it communicated with certain of the jointly-represented Avandia clients in Kansas. While defendants argue they never entered Kansas for any reason related to the Avandia lawsuits, a defendant need not physically present itself in the forum state for personal jurisdiction to exist. *AST Sports Sci., Inc.*, 514 F.3d at 1059. Instead, phone calls, letters, facsimiles, and

emails may provide additional evidence that a defendant purposefully has directed its activities at the forum state by pursuing a continuing business relationship with plaintiff. *Id.* (citations omitted); *see also Rambo v. Am. S. Ins. Co.*, 839 F.2d 1415, 1418 (10th Cir. 1988) ("Certainly, telephone calls and letters may provide sufficient contacts for the exercise of personal jurisdiction.").  In some cases, even dispatching a single telephone call or letter to the forum state may suffice as long as it creates a "substantial connection" with the forum. *Rambo*, 839 F.2d at 1418 (citing *Burger King*, 471 U.S. at 475 n.18).  But such communications, standing alone, will not necessarily meet the due process standard unless they "represent an effort by the defendant to 'purposefully avail[] itself of the privilege of conducting activities within the forum State.'" *Id.* at 1418–19 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)).

Here, plaintiff alleges G&K sent multiple letters, emails and facsimiles about the Avandia cases to plaintiff and plaintiff received them in Kansas.  Plaintiff also alleges that defendants sent letters to the jointly-represented Avandia clients in Kansas.  These communications and, especially, the reason defendants sent them lead the Court to conclude that G&K purposefully directed its activities to Kansas for the purpose of continuing the parties' business relationship.  The Court also concludes that plaintiff's alleged injuries arose from these communications.

Third, plaintiff claims that the parties entered into a contract which required work to be performed in Kansas.  While defendants dispute that the parties' fee-sharing agreement required either plaintiff or defendants to perform work in Kansas, plaintiff alleges that defendants sent partial settlement checks to the Kansas clients for settlement of their Avandia cases.  A defendant's payment of funds into a forum state provides some evidence that defendant purposefully directed its activities at that state.  *See Cont'l Am. Corp. v. Camera Controls Corp.*, 692 F.2d 1309, 1312 (10th Cir. 1982) (concluding that payments into Kansas "provide

circumstantial proof that the parties agreed some performance would be rendered in the forum state."); *see also Yellow Transp., Inc. v. Apex Digital, Inc.*, No. 05-2463-JWL, 2006 WL 416224, at *4 (D. Kan. Feb. 22, 2006) (reasoning that the defendant had made partial payments to Kansas thereby providing "circumstantial proof that the parties agreed that the payment aspect of their contract would be performed at least in part in Kansas").  G&K's transmission of partial settlement payments to Kansas clients provides circumstantial evidence that it agreed to perform some of the parties' agreement in Kansas.  Taking G&K's activities as a whole, the Court concludes that G&K's suit-related contacts with Kansas are sufficient to establish minimum contacts with this forum and they allow the Court to assert personal jurisdiction over it.

Trying to defeat personal jurisdiction, defendants cite two cases from the District of Kansas and argue that G&K's contacts with Kansas are insufficient to establish minimum contacts under the due process analysis.  First, they cite *Biederman v. Schnader, Harrison, Siegal & Lewis,*, 765 F. Supp. 1057 (D. Kan. 1991) (O'Connor, J.), a case in which Kansas plaintiffs sued a Pennsylvania law firm seeking a declaratory judgment that the law firm had been paid in full for legal services provided in connection with a North Carolina lawsuit.  One of the plaintiffs there, on the advice of a third party, traveled to Pennsylvania to retain the law firm for a suit pending in North Carolina.  *Id.* at 1058.  While the Pennsylvania law firm's attorneys made three visits to Kansas during the course of the litigation, "the bulk of the work" in the litigation occurred in Pennsylvania and North Carolina.  *Id.*  Judge O'Connor concluded that "defendant's brief visits to Kansas during discovery, phone calls and letters to Kansas, and checks received by defendant from a Kansas plaintiff [were] not sufficient contacts to support an exercise by the court of personal jurisdiction over this defendant."  *Id.* at 1061.  Instead, Judge O'Connor determined that these contacts were "too attenuated and minimal" for the court to assert personal

jurisdiction over defendant, and the court thus granted defendant's motion to dismiss for lack of personal jurisdiction. *Id.* The facts here differ from *Biederman* and thus counsel a different result.

Unlike the law firm defendant in this case, the defendant in *Biederman* did not solicit plaintiff's business. Instead, the *Biederman* plaintiff initiated contact with the Pennsylvania law firm, traveled to Pennsylvania to retain defendant, and negotiated the attorneys' fee contract with defendant in Pennsylvania. In contrast, plaintiff here alleges that G&K solicited business from it in Kansas by contacting plaintiff and requesting that plaintiff retain G&K as co-counsel for plaintiff's Avandia clients. By purposefully reaching into Kansas and soliciting business here, G&K "purposefully directed" its activities at this forum State.

Second, defendants cite *Worthington v. Small*, 46 F. Supp. 2d 1126 (D. Kan. 1999), a legal malpractice suit brought by a Kansas plaintiff against a Missouri lawyer. There, the parties had entered into a contract for the attorney's legal services which was formed and executed in Missouri. *Id.* at 1128. The parties never met in Kansas, and defendant never conducted any business pertinent to plaintiff's legal claims in Kansas. *Id.* On those facts, Judge Lungstrum concluded that the Kansas plaintiff had failed to establish the minimum contacts necessary for specific jurisdiction over defendant because plaintiff had failed to allege how her own injuries arose from defendant's conduct within the forum state. *Id.* at 1133. The court thus concluded that defendant had not "purposefully" committed any act in Kansas or directed any activity at Kansas. *Id.* In fact, "[n]othing before the court suggest[ed] that defendant advertised his legal services in Kansas *or sought plaintiff out in any way.*" *Id.* (emphasis added). The court also noted that there was no allegation that defendant ever telephoned plaintiff in Kansas or mailed correspondence to plaintiff there. *Id.* But the facts alleged in this case are different.

16

Plaintiff has alleged that G&K "sought plaintiff out" by soliciting plaintiff in Kansas to retain G&K as co-counsel for plaintiff's clients in the Avandia lawsuits. Also, plaintiff here alleges that G&K corresponded with plaintiff in Kansas by telephone, mail, facsimile, and email and communicated with certain jointly-represented clients by mailing correspondence to Kansas. These assertions differ from the ones at issue in *Worthington*.

Defendants also invoke *Worthington* in another respect. *Worthington* concluded the court found that the contract between plaintiff and defendant did not require defendant to take any actions in Kansas. *Id.* at 1133. While the parties here dispute whether their contract required defendants to perform any act in Kansas, plaintiff alleges that the parties entered into a fee sharing agreement that governed the amount of attorneys' fees plaintiff would receive upon settling the Avandia cases. As Judge Rogers noted in the parties' other lawsuit filed with our Court, the parties' agreement to pay plaintiff attorneys' fees, when viewed in the light most favorable to plaintiff, included an implicit agreement that payments would be made to plaintiff in Kansas even though there was no explicit agreement about where the funds were to be delivered. *Hutton & Hutton*, 2014 WL 36313, at *8. Resolving all doubts in favor of plaintiff, as the Court must do at this stage, the Court finds that plaintiff's claims arise from G&K's contacts with Kansas.

Finally, defendants cite several cases decided elsewhere where courts have refused to exercise personal jurisdiction over an out-of-state attorney or law firm in a fee dispute. But each case they cite differs from the facts presented here because the out-of-state attorneys in those cases did not solicit the business from the forum state. *See, e.g.*, *David W. Bernberg, LLC v. Snow*, No. 07-261, 2007 WL 2436694, at *3 (E.D. La. Aug. 22, 2007) (declining to exercise personal jurisdiction over a Mississippi attorney who received an unsolicited referral from a

17

Louisiana attorney to render services in Mississippi); *Jaffe v. Julien*, 754 F. Supp. 49, 53 (E.D. Pa. 1991) (declining to assert personal jurisdiction over a New York law firm and its lawyers where a Pennsylvania lawyer made an "unsolicited referral of business" to a New York law firm of a case litigated in New York on behalf of New York clients); *Shirkey v. McMaster*, 876 S.W.2d 648, 650 (Mo. Ct. App. 1994) (declining to exercise personal jurisdiction over a Kansas lawyer, who was contacted by a Missouri lawyer and hired as local counsel in a Kansas case); *Bolinske v. Herd*, 689 N.W.2d 397, 401 (N.D. 2004) (declining to exercise personal jurisdiction over an out-of-state attorney who an in-state attorney had solicited to represent clients in an out-of-state lawsuit). But the facts alleged here are different. Plaintiff here alleges that defendants solicited plaintiff *in Kansas* to retain G&K as co-counsel in the Avandia lawsuits. This solicitation produced a joint-representation agreement and led G&K to direct additional activities at Kansas in the form of communications with plaintiff and the jointly-represented clients and the payment of settlement funds to the Avandia clients in Kansas.

In sum, the Court finds that G&K's "suit-related conduct [has] create[d] a substantial connection with the forum State" and makes it proper for the Court to assert specific jurisdiction over it. *Walden*, ___ U.S. at ___, 134 S. Ct. at 1121. The two related aspects of G&K's relationship with the forum state are satisfied here because (1) the contacts are ones that G&K itself created by soliciting plaintiff's business in Kansas, by communicating with plaintiff and the jointly represented clients in Kansas, and by making payments into Kansas, and (2) G&K's contacts are with the forum state itself, and are not based merely on contacts with persons who reside there. *Id.* at 1122 (citations omitted).

## 2.   Specific Jurisdiction Over Defendant Thomas Girardi

The Court now turns to plaintiff's assertion that Court has personal jurisdiction over the second defendant, Thomas Girardi.  Plaintiff asserts that defendant Thomas Girardi is subject to jurisdiction in Kansas because he allegedly committed a tort in Kansas by sending defamatory letters to at least three of the Avandia clients in Kansas.[3]  The Tenth Circuit has set forth the following "effects test" to determine in a tort case whether a defendant has purposefully directed his activities to the forum state:  "(a) an intentional action . . . (b) expressly aimed at the forum state . . . with (c) knowledge that the brunt of the injury would be felt in the forum state . . . ." *Dudnikov v. Chalk & Vermilion Fine Arts*, 514 F.3d 1063, 1072 (10th Cir. 2008) (interpreting *Calder v. Jones*, 465 U.S. 783, 789–90 (1984)).

Plaintiff has established the first element of this test by alleging that Mr. Girardi committed the intentional act of mailing letters to Kansas containing false and defamatory statements about plaintiff.  The Tenth Circuit has noted that the "effects test" requires the defendant to have committed an intentional act but the court has not decided "whether under *Calder* plaintiffs must also allege that the act itself was wrongful or tortious in some sense."

---

[3]     Defendants argue that the Court cannot consider the alleged defamatory letters as evidence for jurisdictional purposes because these letters are privileged attorney-client communications.  Defendants, however, cite no case law to support their proposition.  Plaintiff agrees that these letters contain attorney-client communications, but it asserts that the clients' subsequent waiver of the privilege rendered the privilege moot.  *See* Pl.'s Resp. to Defs.' Mot. to Dismiss Exs. 3 (Doc. 16-3) at ¶ 6, 4 (Doc. 16-4) at ¶ 6, & 5 (Doc. 16-5) at ¶ 6.  Plaintiff likewise cites no case law to support its mootness argument.

At this initial stage of determining whether the Court may exercise personal jurisdiction over defendants, the Court need not decide whether the content of the communications are privileged or whether the clients have waived the privilege.  Instead, the Court must accept as true plaintiff's allegations.  *Wenz v. Memery Crystal*, 55 F.3d 1503, 1505 (10th Cir. 1995); *see also Giusto v. Ashland Chem. Co.*, 994 F. Supp. 587, 592–94 (E.D. Pa. 1998) (accepting plaintiff's allegations that defendants made defamatory statements as true for purposes of asserting personal jurisdiction over defendants before considering the merits of defendants' argument that the alleged defamatory statements were privileged).  Because plaintiff here alleges that Mr. Girardi made false and defamatory statements about plaintiff in the letters he sent to the jointly-represented clients (Pl.'s Pet. (Doc. 1-1) at ¶¶ 25–28), the Court must accept these allegations as true for purposes of determining whether personal jurisdiction exists over Mr. Girardi.

*Dudnikov*, 514 F.3d at 1072.  This distinction is irrelevant here because plaintiff has alleged both that Mr. Girardi committed an intentional act and that his act was wrongful or tortious.

The second element of the effects text, which requires that a defendant "expressly aim" his conduct at the forum state, "focuses more on a defendant's intentions—where was the 'focal point' of [defendant's] purposive efforts." *Id.* at 1075.  While other courts have determined that this prong of the "effects test" "is satisfied when the defendant individually targets a known forum resident," the Tenth Circuit has "taken a somewhat more restrictive approach, holding that the forum state itself must be the 'focal point of the tort.'" *Id.* at 1075 n.9 (citing *Far W. Capital, Inc. v. Towne*, 46 F.3d 1071, 1080 (10th Cir. 1995) (further citations and internal quotation marks omitted)).  Here, plaintiff has alleged that Mr. Girardi expressly aimed his conduct at Kansas by sending the allegedly defamatory letters to Kansas clients in Kansas.  The Court finds these allegations sufficient to satisfy the second prong of the effects test.

The third element of the effects test "concentrates on the consequences of the defendant's actions—where was the alleged harm actually felt by the plaintiff." *Id.* at 1075.  Here, the alleged harm was experienced by plaintiff, a Kansas law firm, in Kansas.  But the "mere foreseeability" of causing injury in the forum state, standing alone, is insufficient to support personal jurisdiction; plaintiff must allege "something more." *Id.* at 1077 (citations omitted).  A plaintiff may show the requisite "something more" by satisfying the first two prongs of the "effects test" and show also that "defendant acted with more than foresight (or knowledge) that effects would be felt in [the forum state]." *Id.*  Plaintiff here has satisfied all three prongs of the test by alleging that Mr. Girardi committed intentional actions expressly aimed at Kansas that caused injury in Kansas to plaintiff.  Mr. Girardi knew when he committed these acts that plaintiff was a Kansas law firm, and he either knew or should have known that plaintiff would

experience the harm in Kansas.  Therefore, plaintiff's allegations are sufficient to show that Mr. Girardi purposefully directed his activities to Kansas to subject him to personal jurisdiction in this lawsuit.

### 3.   Fair Play and Substantial Justice

Because defendants have sufficient minimum contacts with the forum state, this Court also must decide whether the exercise of personal jurisdiction "would offend traditional notions of fair play and substantial justice."  *Newsome v. Gallacher*, 722 F.3d 1257, 1271 (10th Cir. 2013) (citation and internal quotation marks omitted).  When making this determination about the Constitutional reasonableness of jurisdiction, courts consider the following factors:

> (1) the burden on the defendant, (2) the forum state's interest in resolving the dispute, (3) the plaintiff's interest in receiving convenient and effective relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interest of the several states in furthering fundamental substantive social policies.

*OMI Holdings, Inc.*, 149 F.3d at 1095 (citing *Asahi Metal Indus. Co. v. Superior Court of Cal.*, 480 U.S. 102, 113 (1987)).  After considering all of the parties' arguments, the Court holds that the exercise of personal jurisdiction over these defendants is not constitutionally unreasonable.

First, the burden on defendants is not a significant one.  To overcome the justification for the exercise of jurisdiction on this basis, the inconvenience to defendants must be "so great as to constitute a deprivation of due process."  *Rainy Day Books, Inc. v. Rainy Day Books & Cafe, LLC*, 186 F. Supp. 2d 1158, 1166 (D. Kan. 2002).  While defendants argue that it is inconvenient for them to defend a case in Kansas, where they have no office or employees or any other consistent connection to the state, our Court has recognized that it is not constitutionally unreasonable to require a defendant to defend such an action "[i]n this era of Internet communications, faxes, telecommunications, and relatively inexpensive travel."  *Id.*; *see also*

*Brooke Credit Corp. v. Texas Am. Insurers, Inc.*, No. 06-1367-JTM, 2007 WL 1586082, at *5

(D. Kan. May 31, 2007).  Moreover, plaintiff has alleged that defendants used such

communications to reach into Kansas to solicit business.  Under these facts, defendants have not

demonstrated that exercising personal jurisdiction over them would impose a substantial burden.

Second, the forum state—Kansas—has an interest in resolving the dispute.  "States have

an important interest in providing a forum in which their residents can seek redress for injuries

caused by out-of-state actors."  *Vestring v. Halla*, 920 F. Supp. 2d 1189, 1196 (D. Kan. 2013)

(citing *Burger King*, 471 U.S. at 483).  Relying on *Vestring*, defendants assert that this factor

does not favor asserting personal jurisdiction when the subject of the dispute largely occurs

outside the forum state.  *See id.*  In *Vestring*, Chief Judge Marten concluded that this factor did

not heavily favor jurisdiction where the only connections to Kansas were plaintiffs' residence in

Kansas and the contract negotiations took place here.  *Id.*  Defendants argue that the facts of this

case resemble *Vestring* because the fee dispute involves:  (a) the Avandia cases that were

litigated and settled in California; and (b) derives from expenses G&K incurred almost entirely

in California, not in Kansas.  But, as explained above, plaintiff has alleged several facts showing

that the parties' agreement established a connection to Kansas.  Resolving all doubts in favor of

plaintiff, plaintiff alleges that defendants requested it to prepare and assemble information in

Kansas to send to defendants in California, that defendants made partial settlement payments to

clients in Kansas, and that the parties' agreement contained an implicit agreement to make

payments to plaintiff in Kansas.  Under these facts, the Court concludes the second factor tips in

favor of plaintiff because Kansas has an interest in providing a forum for its residents to seek

redress of injuries caused by out-of-state actors.

The third factor is a neutral one.  Plaintiff has failed to demonstrate that it cannot seek convenient or effective relief in a jurisdiction other than Kansas.  "This factor may weigh heavily in cases where the plaintiff's chances of recovery will be greatly diminished by forcing him to litigate in another forum because of that forum's laws or because the burden may be so overwhelming as to practically foreclose pursuit of the lawsuit."  *OMI Holdings, Inc.*, 149 F.3d at 1097 (citation omitted).  While plaintiff may prefer to bring this action in its home state, it has not shown that litigating this lawsuit in another forum would cause an overwhelming burden.

The fourth factor requires the Court to examine "whether the forum state is the most efficient place to litigate the dispute."  *Id.*  "Key to this inquiry [is] the location of witnesses, where the wrong underlying the lawsuit occurred, what forum's substantive law governs the case, and whether jurisdiction is necessary to prevent piecemeal litigation."  *Id.* (internal citations omitted).  Here, the parties dispute whether the relevant evidence is located in Kansas or California.  Defendants assert that the evidence is located in California where the Avandia cases were litigated, but plaintiff contends that many relevant witnesses are located in Kansas.  Plaintiff also asserts that the wrongs committed in this lawsuit occurred in Kansas, and that Kansas law will apply to the parties' dispute.  Indeed, defendants admit that resolving this dispute requires an assessment of the parties' agreement which implicates both Kansas and California's interests.  From these facts, defendants have failed to convince the Court that another jurisdiction is the most efficient place to litigate the dispute.

Finally, the parties agree that the fifth factor—the state's interest in furthering fundamental substantive social policies—is neutral here.  The Court cannot discern any interest that either state may have in furthering fundamental social policies in this litigation.  Thus, the Court agrees that this factor is neutral.

Considering all five factors together, the Court finds it reasonable and consistent with the notions of "fair play and substantial justice" to assert personal jurisdiction over defendants in this lawsuit.  As noted at the outset, plaintiff's burden of establishing personal jurisdiction over defendants in the preliminary stages of litigation is a light one.  *AST Sports Sci., Inc.*, 514 F.3d at 1056 (citation omitted).  Plaintiff has carried this burden and so the Court denies defendants' motion to dismiss for lack of personal jurisdiction.

## III.    Motion to Compel Arbitration

Having decided that both defendants are properly subject to suit in Kansas, the Court turns to defendants' assertion that the parties agreed to resolve these disputes by arbitrating them, not by litigating.  Defendants' argument relies on the Master Settlement Agreement ("MSA") memorializing the settlement of the Avandia lawsuits with GlaxoSmithKline.  This MSA contains the following arbitration provision:

> Any challenges to or disputes arising out of or relating to an alleged violation of this Agreement, including but not limited to disputes between GSK and Participating Law Firms and/or Participating Claimants and disputes between or among Participating Law Firms and/or members of Participating Law Firms arising out of or in connection with this Agreement, shall be referred for binding determination to a neutral arbitrator who does not have a relationship with Judicial Arbitration Mediation Services ("JAMS"), with all costs to be shared equally.  The parties shall work together to agree on a binding neutral arbitrator to resolve any and all disputes.

Sealed Ex. A in Support of Defs.' Mot. to Dismiss (Doc. 13) at ¶ IV.X.  The MSA defines "Participating Law Firms" to include G&K and "all other law firms, including all attorney members of or affiliated with each firm, that represent or otherwise have any financial interest in the Participating Claimants whose cases and/or claims are the subject of this Agreement."  *Id.* at ¶ III.B.  The MSA also requires that "[e]ach Participating Law Firm, including all its current and future attorney members of or affiliated with each firm, acknowledges that it shall be bound to

the terms and conditions of this Agreement and any Addendum or exhibits hereto." *Id.*  A list of

Participating Law Firms is attached to the MSA as Exhibit A and that list includes plaintiff,

Hutton & Hutton.  *Id.* at 37 (identifying plaintiff and 50 other law firms as "Participating Law

Firms").  G&K counsel signed the MSA "On Behalf Of The Participating Claimants And The

Participating Law Firms." *Id.* at 36.

Defendants argue that the claims that plaintiff asserts in this lawsuit are disputes

"between or among Participating Law Firms . . . arising out of or in connection with" the MSA,

and therefore, they "shall be referred" to arbitration under the MSA's arbitration clause.

Defendants assert that the breach of contract and breach of fiduciary duty claims are "in

connection with" the MSA because these claims rely on the allegation that defendants failed to

share proceeds from the MSA with plaintiff.  Defendants likewise argue that the defamation

claim is "in connection with" the MSA because the alleged defamatory communication was

made during the ongoing dispute over referral funds.

Plaintiff asserts that the arbitration agreement does not apply to any of the three claims

plaintiff asserts here.  In general terms, plaintiff bases its position on the theory that its claims do

not arise from the MSA, but arise, instead, from the parties' fee sharing agreement.  Plaintiff also

argues that it was not a signatory to the MSA, was not consulted about the terms of the MSA,

and did not even see the MSA until G&K had signed it.  But plaintiff concedes it gave G&K

authority to settle the Avandia lawsuits on its behalf, and plaintiff never disputes that G&K

signed the MSA on behalf of the "Participating Law Firms," a term that includes plaintiff.  While

plaintiff never explicitly argues that it did not agree to the MSA's arbitration provision, plaintiff

does assert that it never authorized G&K to alter plaintiff's rights under the fee sharing

agreement unilaterally by subjecting those rights to an arbitration provision in the MSA.

Plaintiff's arguments present two distinct questions:  first, whether plaintiff agreed to arbitrate; and second, if it did agree to arbitrate, whether the particular disputes asserted here fall within the scope of the MSA's arbitration provision.  The Court cannot decide the first question because the record before the Court currently presents genuine issues of material fact whether the parties agreed to arbitrate.  Therefore, the Court must hold a trial on this issue, and thus it does not reach the second question.

### A.  Did Plaintiff Agree to Arbitrate?

The Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.*, requires that "[a] written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable . . . ."  9 U.S.C. § 2.  Section 3 of the FAA permits the Court to stay litigation in favor of arbitration.  The United States Supreme Court interprets the FAA to establish a strong federal policy in favor of arbitration thus requiring "liberal reading of arbitration agreements." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 23 n.27 (1983); *see also ARW Exploration Corp. v. Aguirre*, 45 F.3d 1455, 1462 (10th Cir. 1995) (the FAA "evinces a strong federal policy in favor of arbitration" (citing *Shearson/Am. Express, Inc. v. McMahon*, 482 U.S. 220, 226 (1987))).

When an agreement contains an arbitration clause, "a presumption of arbitrability arises . . . ." *ARW Exploration Corp.*, 45 F.3d at 1462 (citing *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986)).  But, "because 'arbitration is a matter of contract' and the authority of an arbitrator arises only from the parties agreement to that forum in advance, 'a party cannot be required to submit to arbitration any dispute which [it] has not agreed so to submit.'" *Sanchez v. Nitro-Lift Techs., L.L.C.*, 762 F.3d 1139, 1146 (10th Cir. 2014) (quoting

*AT & T Techs.*, 475 U.S. at 648–49); *see also Hicks v. Cadle Co.*, 355 F. App'x 186, 192 (10th Cir. 2009) ("[T]he FAA's proarbitration policy does not operate without regard to the wishes of the contracting parties." (citations and internal quotation marks omitted)).

The presumption of arbitrability thus "falls away," when the parties dispute whether a valid and enforceable arbitration agreement exists. *See Riley Mfg. Co. v. Anchor Class Container Corp.*, 157 F.3d 775, 779 (10th Cir. 1998) (citation omitted). A court may compel arbitration "only when satisfied that the making of the agreement [to arbitrate] is not at issue." *Nat'l Am. Ins. Co. v. SCOR Reinsurance Co.*, 362 F.3d 1288, 1290 (10th Cir. 2004) (citation and internal quotation marks omitted).

With these general principles in mind, the Court turns to the parties' arguments. Plaintiff contends that it never agreed to arbitrate any dispute over the parties' fee sharing agreement. Thus, the Court examines whether a valid and enforceable arbitration agreement exists. And because the parties dispute the existence of an agreement to arbitrate, the Court applies no presumption of arbitrability.

When the parties dispute whether an arbitration agreement exists, the party moving to compel arbitration bears a burden similar to the one a summary judgment movant faces—it must make an initial showing that a valid arbitration agreement exists. *Hancock v. Am. Tel. & Tel. Co., Inc.*, 701 F.3d 1248, 1261 (10th Cir. 2012); *SmartText Corp. v. Interland, Inc.*, 296 F. Supp. 2d 1257, 1262–63 (D. Kan. 2003) (citations omitted); *Phox v. Atriums Mgmt. Co.*, 230 F. Supp. 2d 1279, 1282 (D. Kan. 2002). If the moving party carries this burden, the burden shifts to the non-moving party to show a genuine issue of material of fact about the formation of the agreement to arbitrate. *Hancock*, 701 F.3d at 1261; *SmartText Corp.*, 296 F. Supp. 2d at 1263; *Phox*, 230 F. Supp. 2d at 1282. If the non-moving party "demonstrates a genuine issue of

material fact, then a trial on this issue is required." *SmartText Corp.*, 296 F. Supp. 2d at 1263 (citing 9 U.S.C. § 4 (if the making of the arbitration agreement is seriously disputed, then "the court shall proceed summarily to the trial thereof") (further citation omitted)); *see also Howard v. Ferrellgas Partners, L.P.*, 748 F.3d 975, 978 (10th Cir. 2014).

To decide whether the parties agreed to arbitrate, the Court applies "'ordinary state-law principles that govern the formation of contracts.'" *Hardin v. First Cash Fin. Servs., Inc.*, 465 F.3d 470, 475 (10th Cir. 2006) (quoting *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)). Here, the parties do not identify which state law governs this contract formation issue, but defendants note that the MSA contains a Delaware choice of law provision. This choice of law issue is not pivotal because the legal principles governing contract formation—at least as these principles apply to the current issue—do not vary significantly from state to state.

For example, many courts have recognized that ordinary contract and agency principles may bind a non-signatory to an arbitration agreement. *See, e.g.*, *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631 (2009) (explaining that "traditional principles of state law allow a contract to be enforced by or against nonparties to the contract through 'assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver and estoppel,'" and so an arbitration provision may bind a nonsignatory to the agreement (quoting 21 R. Lord, *Williston on Contracts* § 57:19, p. 183 (4th ed. 2001))); *Gibson v. Wal-Mart Stores Inc.*, 181 F.3d 1163, 1170 n.3 (10th Cir. 1999) (concluding that third-party beneficiaries and agents of a signatory may be bound by an arbitration agreement); *Arnold v. Arnold Corp.–Printed Commc'ns for Bus.*, 920 F.2d 1269, 1281 (6th Cir. 1990) (explaining that nonsignatories of an arbitration agreement may be bound by the agreement under ordinary contract and agency principles and noting that the rule is an "outgrowth of the strong federal policy favoring

arbitration"); *Hemphill v. Ford Motor Co.*, 206 P.3d 1, 7–8 (Kan. Ct. App. 2009) (concluding that nonsignatory may be obligated to arbitrate claims arising from an agreement containing no arbitration clause if the claims are intertwined with ones involving parties who signed a related agreement containing an arbitration agreement); *NAMA Holdings, LLC v. Related World Mkt. Ctr., LLC*, 922 A.2d 417, 430–31 (Del. Ch. 2007) (refusing to bind "[a] non-signatory to a contract [to] an arbitration clause unless traditional principles of contract and agency law equitably confer upon that party signatory status with regard to the underlying agreement." (citation and internal quotation marks omitted)).

Similarly, an agent's signature binds its principal to an arbitration agreement when (1) the agent was acting on the principal's behalf, and (2) the cause of action arises out of that agency relationship. *E.I. DuPont de Nemours and Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.*, 269 F.3d 187, 198 (3d Cir. 2001) (citation omitted). Here, plaintiff concedes it conferred actual authority to its agent, G&K, to settle the Avandia cases with GlaxoSmithKline. Pl.'s Resp. to Defs.' Mot. to Dismiss (Doc. 16 at 23). This actual authority that plaintiff, as principal, granted G&K, as its agent, necessarily includes the implied authority to take the steps reasonably necessary to accomplish the principal's expressed objectives. Restatement (Third) of Agency § 2.02 (2006); *see also Dweck v. Nasser*, 959 A.2d 29, 39–40 (Del. Ch. 2008), *vacated on other grounds by* 966 A.2d 348 (Del. Supr. Feb. 17, 2009) ("[I]mplied authority is a derivation of actual authority and often means 'actual authority either (1) to do what is necessary, usual, and proper to accomplish or perform an agent's express responsibilities or (2) to act in a manner in which an agent believes the principal wishes the agent to act based on the agent's reasonable interpretation of the principal's manifestation in light of the principal's objectives and other facts known to the agent.'" (quoting Restatement (Third) of Agency § 2.02 (2006))).

#### 1. Did Plaintiff Confer Authority on G&K to Agree to the Arbitration Provision?

Here, plaintiff concedes it gave G&K authority to settle the Avandia cases. Also, plaintiff does not assert that it expressly limited this authority in any fashion. Thus, plaintiff authorized G&K to take reasonable and necessary actions to accomplish plaintiff's objective of settling the Avandia cases for their jointly-represented clients. In this case, G&K's authority may have included the power to agree to the broad arbitration provision contained in the MSA. *See Sorrell v. Regency Nursing, LLC*, No. 3:14–CV–00304–TBR, 2014 WL 2218175, at *6 (W.D. Ky. May 28, 2014) (concluding that a power of attorney ("POA") did not expressly authorize an agent to enter into arbitration agreements and so "the Court [could] find no reasonable interpretation of the POA that would limit [the agent's] authority to do so on [the principal's] behalf, and thus, the agent had the authority to sign the arbitration agreement on behalf of the principal and bind the principal to arbitrate her claims); *cf. The Rice Co. (Suisse), S.A. v. Precious Flowers, Ltd.*, 523 F.3d 528, 538 (5th Cir. 2008) (finding that the principal, by expressly limiting the authority of its agent to sign a bill of lading, did not confer authority to be bound by the arbitration clause in that bill of lading).

But the record provided by the parties on this issue does not resolve the scope of G&K's authority in the definitive manner required by the governing procedural standard. G&K presents no evidence establishing that plaintiff conferred authority on G&K to agree to the arbitration provision. However, G&K argues that because plaintiff never limited expressly G&K's authority to negotiate the settlement, its authority included agreement to the arbitration provision. But G&K also never explains why the Court can decide as a matter of law whether agreeing to the arbitration provision was reasonable or necessary to accomplish the Avandia settlement. In contrast, plaintiff concedes that it gave G&K authority to settle the Avandia cases, but denies

that this authority included the authority to agree to the broad arbitration clause contained in the

MSA.  Plaintiff also has furnished no evidence showing that plaintiff ever objected to the

arbitration provision in the MSA once G&K provided the MSA to it.  Indeed, by failing to object

to the arbitration clause, one reasonably could surmise that plaintiff ratified G&K's conduct

agreeing to the arbitration clause.  But, given the summary-judgment-like procedural setting in

which the Court operates when determining whether a valid agreement to arbitrate exists, one

reasonably could reach the opposite conclusion—that plaintiff did not agree to G&K's conduct.

Based on the current record, the Court cannot conclude as a matter of law that plaintiff

granted G&K the authority to agree to the arbitration clause in the MSA.  The Court determines

that plaintiff has presented a genuine issue of material of fact about the formation of the

agreement to arbitrate, and this general issue requires the Court to decide it in a summary trial.

*See Howard*, 748 F.3d at 984 ("But when factual disputes may determine whether the parties

agreed to arbitrate, the way to resolve them . . . is by proceeding *summarily* to trial.").[4]

Plaintiff cites three cases as support for its position that the Court can decide that the

arbitration provision in the MSA does not bind plaintiff.  The Court is not persuaded by any of

them.  In each case, the court refused to compel arbitration of plaintiff's employment

discrimination claims because the undisputed evidence established that plaintiff never had agreed

to an arbitration clause.  *See Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 162 (3d

Cir. 2009) (holding employment discrimination claims asserted by a law firm shareholder were

not arbitrable under the firm's bylaws because the shareholder neither signed the bylaws nor

---

[4]      *See also Bellman v. i3Carbon, LLC*, 563 F. App'x 608, 616 (10th Cir. 2014) ("[I]f a genuine
dispute of material fact exists, the Federal Arbitration Act . . . calls for a summary trial" (citation
omitted)); 9 U.S.C. § 4 (explaining that where a party petitions the Court for an order compelling
arbitration, "[i]f the making of the arbitration agreement or the failure, neglect, or refusal to perform the
same be in issue, the court shall proceed summarily to the trial thereof.  If no jury trial be demanded by
the party alleged to be in default . . . the court shall hear and determine such issue.  Where such an issue is
raised, the party alleged to be in default may . . . demand a jury trial of such issue . . . .").

received a copy of them); *Prudential Ins. Co. of Am. v. Lai*, 42 F.3d 1299, 1305 (9th Cir. 1994)

(explaining that a Title VII plaintiff "may only be forced to forego her statutory remedies and

arbitrate her claims if she has knowingly agreed to submit such disputes to arbitration"); *Phox*,

230 F. Supp. 2d at 1283 (concluding that an arbitration clause in an employee handbook was not

an enforceable agreement requiring plaintiff to arbitrate Title VII claim).  Unlike the facts

presented here, the undisputed material facts in plaintiff's cases allowed the courts to determine,

as a matter of law, the issue whether the parties had agreed to arbitrate.  In contrast, genuine

issues of fact preclude the Court from making such a determination here.

### 2.   Is Plaintiff Equitably Estopped from Avoiding the Arbitration Clause?

Although not argued expressly by the parties, the Court also has considered whether

plaintiff is estopped from avoiding the arbitration clause because it seeks to benefit from the

MSA by recovering referral fees on the settlements the MSA memorializes.  Under estoppel

principles, a party cannot avoid an arbitration clause in a contract while suing to obtain a benefit

under that same contract.  *See E.I. DuPont de Newmours and Co.*, 269 F.3d at 200 (estoppel

principles prevent "a non-signatory from embracing a contract, and then turning its back on the

portions of the contract, such as an arbitration clause, that it finds distasteful" (citations

omitted)); *see also Bellman v. i3Carbon, LLC*, 563 F. App'x 608, 616 (10th Cir. 2014)

(explaining that "'[i]n the arbitration context, the [equitable estoppel] doctrine recognizes that a

party may be estopped from asserting that the lack of his signature on a written contract

precludes enforcement of the contract's arbitration clause when he has consistently maintained

that other provisions of the same contract should be enforced to benefit him'" (quoting *Int'l

Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH*, 206 F.3d 411, 418 (4th Cir. 2000));

*ChampionsWorld, LLC v. U.S. Soccer Fed'n, Inc.*, 487 F. Supp. 2d 980, 987 (N.D. Ill. 2007) ("A

nonsignatory party is estopped from avoiding arbitration if it knowingly seeks the benefits of the contract containing the arbitration clause." (citing *Zurich Am. Ins. Co. v. Watts Indus., Inc.*, 417 F.3d 682, 688 (7th Cir. 2005)); *NAMA Holdings, LLC v. Related World Mkt. Ctr., LLC*, 922 A.2d 417, 432 (Del. Ch. 2007) (a party is estopped from arguing that its claims are not arbitrable if it derives a direct benefit from the contract containing the arbitration clause). *Cf. Hemphill v. Ford Motor Co.*, 206 P.3d 1, 9 (Kan. Ct. App. 2009) (under an estoppel theory, a nonsignatory to the arbitration agreement may compel a party who signed the arbitration provision to arbitrate a claim that is closely intertwined with ones covered by the arbitration provision).

The Court, however, cannot conclude on the current record that plaintiff is equitably estopped from avoiding the MSA's arbitration provision. The Tenth Circuit has refused to enforce an arbitration clause based on equitable estoppel when the non-signatory does not receive direct benefits from or seek to enforce its rights under the contract containing the arbitration clause. *Bellman*, 563 F. App'x at 616. Similarly, in *DuPont*, the Third Circuit refused to compel arbitration based on an estoppel theory because no evidence existed that the party seeking to avoid arbitration had "embraced the [contract] itself during the lifetime of the [contract], or that it received any *direct* benefit under the [contract]." 269 F.3d at 200.

Here, plaintiff does not seek to obtain a direct benefit from or enforce its rights under the MSA. Instead, plaintiff seeks to recover the fees it claims defendants owe it under a separate, oral agreement—the fee sharing agreement. Indeed, plaintiff bases its breach of contract claim on defendants' alleged breach of the fee sharing agreement, not the MSA. (Doc. 1-1 at ¶ 16). Plaintiff also alleges that defendants breached their fiduciary duties in a number of ways including their refusal to compensate plaintiff in accordance with the terms of the fee sharing agreement, not the MSA. (*Id.* at ¶ 19)

33

Defendants argue, however, that plaintiff seeks to enforce the MSA with this lawsuit because, without the MSA, plaintiff has no basis for claiming that defendants owe it referral fees from the Avandia settlement. While it is true that the MSA generated the fees that plaintiff seeks to recover in this lawsuit, plaintiff does not invoke the MSA as the source of *its* right to share in the referral fees. Instead, plaintiff relies on the fee sharing agreement as the source of *its* right to recover the amount it claims defendants owe it. The Tenth Circuit has recognized this distinction in earlier cases arising from similar arbitration and estoppel facts.

As the Circuit explained, an agreement may be "factually significant" to a plaintiff's claims without forming the legal basis for the claims. *Bellman*, 563 F. App'x at 617. Specifically, when a plaintiff is not attempting to hold the defendant liable for duties imposed by the agreement and plaintiff's claims do not depend on whether the defendant's conduct was proper under the agreement, that agreement does not form the basis for the claim even if the agreement is "factually significant." *Id.* (citing *Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 449 F. App'x 704, 710 (10th Cir. 2011) (further citation omitted). Here, the MSA is factually significant to plaintiff's claims, but plaintiff does not assert any claim for breach of the MSA and does not seek to enforce any rights or remedies created by the MSA. Thus, based on the current record before the Court, the MSA does not form the legal basis for plaintiff's claim. On these facts, the Court concludes that plaintiff is not estopped from avoiding the MSA's arbitration clause.

In short, the Court cannot conclude as a matter of law that equitable estoppel forbids plaintiff from avoiding the arbitration provision in the MSA. Still, the Court recognizes that it may need to revisit this issue as the facts develop during the summary trial about arbitrability.

**B.  Does this Dispute Fall Within the Scope of the Arbitration Provision?**

As noted above, the Court does not reach the second question—whether the parties'
dispute falls within the scope of the MSA's arbitration provision—because the current record
does not permit it to decide the agreement-to-arbitrate question.  The Court will proceed to a
summary trial on the first issue.  If that trial determines that the parties did agree to arbitrate, the
Court then will decide whether the claims asserted in this case fall within the scope of the
arbitration provision.  *See Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002)
(whether an arbitration clause applies to a particular type of controversy is a question for the
court to decide).

## IV.    Motion To Dismiss For Failure to State a Claim

Last, defendants argue that the Court should dismiss plaintiff's breach of fiduciary duty
(Count II) and defamation (Count III) claims for failure to state a claim.  But because the Court
is unable to decide on the current record whether the parties must submit these claims to
arbitration, it cannot decide defendants' motion to dismiss for failure to state a claim on the
merits.  The Court denies defendants' motion to dismiss without prejudice.

## V.    Conclusion

The Court grants in part and denies in part defendants' motion to dismiss.  As described
above, the Court determines that defendants are subject to personal jurisdiction in Kansas, and
therefore it denies defendants' motion to dismiss for lack of personal jurisdiction.  The Court
also denies defendants' motion to compel arbitration and orders a summary trial on this issue.
Finally, the Court declines to address the merits of defendants' motion to dismiss for failure to
state a claim because it cannot determine based on the current record whether these claims are
arbitrable.  Thus, the Court denies defendants' motion to dismiss without prejudice.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendants' Motion to Dismiss or, Alternatively, to Compel Arbitration (Doc. 9) is granted in part and denied in part.

**IT IS FURTHER ORDERED THAT** the Court will determine the issue whether the parties agreed to arbitrate the claims asserted in this lawsuit at a summary trial. The Court directs the parties jointly to contact Judge Sebelius promptly and request that he establish a schedule for expedited discovery on the issue of arbitrability (if any additional discovery is needed) and for a summary trial on that issue only. Finally, the Court directs the parties to discuss with one another and advise Judge Sebelius whether the summary trial should be a jury trial or a bench trial. If the parties disagree on that issue, they should ask Judge Sebelius to establish a briefing scheduling that will present that issue for decision sufficiently in advance of the trial.

**IT IS SO ORDERED.**

**Dated this 31st day of March, 2015, at Topeka, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**

36